UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SEAN P. TWAITS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )      CAUSE NO. 1:12-CV-00162 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

Plaintiff Sean Twaits appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be REVERSED, and the case will be REMANDED for further

proceedings in accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Twaits applied for DIB and SSI in November 2008, alleging disability beginning on

August 12, 2008.  (Tr. 15, 136-45.)  The Commissioner denied his application initially and upon

reconsideration (Tr. 81-88, 91-96), and Twaits requested an administrative hearing (Tr. 97).  A

hearing was conducted by Administrative Law Judge ("ALJ") Terry Miller on April 9, 2010, at

which Twaits, who was represented by counsel; Twaits's AIDS Task Force case manager; and a

---

[1] All parties have consented to the Magistrate Judge.  (Docket # 13); *see* 28 U.S.C. § 636(c).

1

vocational expert ("VE") testified.  (Tr. 34-76.)  On September 30, 2010, the ALJ rendered an

unfavorable decision to Twaits, concluding that he was not disabled because he could perform a

significant number of jobs in the economy.  (Tr. 15-28.)  The Appeals Council denied his request

for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-11.)

On May 23, 2012, Twaits filed a complaint with this Court, seeking relief from the

Commissioner's final decision.  (Docket # 1.)  Twaits's sole argument on appeal is that the ALJ

improperly evaluated the credibility of his testimony.  (Opening Br. of Pl. in Social Security

Appeal Pursuant to L.R. 7.3 ("Opening Br.") 11-13.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Twaits was forty-one years old (Tr. 39), had completed

high school and two years of college education (Tr. 41), and had previously worked as a chef

(Tr. 42).  Twaits alleges he became disabled due to chronic low back pain with lumbar spine

degenerative changes, history of being HIV positive, history of Hepatitis C, and bipolar

disorder/depression and anxiety.  (Opening Br. 2.)

### B.  Twaits's Testimony at the Hearing

At the hearing, Twaits testified that he lives in a second floor apartment with a roommate

and had studied culinary arts and computer networking during his two years of college.  (Tr. 40-

41.)  Although he became a certified chef in 1999, he was unable to complete his computer

networking studies due to financial constraints.  (Tr. 41-42.)  He last worked as a full-time chef

at a restaurant until he took a medical leave of absence, mainly due to his back pain, and never

_____

[2] In the interest of brevity, this Opinion recounts only the portions of the 593-page administrative record necessary to the decision.

returned.  (Tr. 42, 44.)

Twaits indicated that his primary physical condition is extreme lower back pain that is constant and located just below his belt.  (Tr 43-44.)  He also experiences shooting pains through his hips and down both legs.  (Tr. 44.)  Twaits rated his pain as a three on a daily basis, but represented that the pain can increase to an eight, where it stays for two to three days.  (Tr. 45.)  His pain level increases primarily due to the weather, but also when he lifts objects that are too heavy and sometimes when he walks his dog.  (Tr. 45, 65.)  To relieve his eight level pain, which he experiences at least five days per month, Twaits has to lie down and put a pillow under or between his legs.  (Tr. 64-65.)  During these days, he spends at least 80 percent of his day lying down.  (Tr. 65.)  Since December 2008, Twaits has been on Amitrityline for the shooting pains and a Fentanyl Transdermal patch for the constant pain.  (Tr. 46.)  He has also had three steroid injections for his pain; the first did not help, the second helped for only a few months, and the third, in addition to physical therapy, has been helping.  (Tr. 46-47.)

Besides low back pain, Twaits testified that he also has Hepatitis C, HIV, and bipolar disorder, but that his HIV is "pretty under control" and he does not really experience symptoms from it.  (Tr. 43-44, 48.)  His Hepatitis C causes fatigue that comes and goes.  (Tr. 50.)  Although his fatigue has gotten better since he finished his Hepatitis C treatment, he still experiences some.  (Tr. 51.)  For his bipolar disorder, which was diagnosed when he was 15 and consists of more lows than highs, Twaits has seen a counselor since March 2009.  (Tr. 55-56.)

Regarding his physical abilities, Twaits estimated that he could walk for roughly a half hour at a time before starting to feel back pain and shooting pain through his hips and legs.  (Tr. 53.)  At that point, depending on how bad his pain was, Twaits would either need to sit or lie

down to recover for at least a half hour. (Tr. 53-54.) On the other hand, Twaits indicated that he could probably stand for an hour or an hour and a half "before it starts to hurt really bad" and sit for about an hour and twenty minutes to an hour and thirty minutes. (Tr. 54.) He does not like to lift or carry more than twenty pounds and stated that bending over aggravates his pain; he has to sit down to put on his shoes and socks and get dressed. (Tr. 54, 61.) Twaits also indicated that he occasionally has trouble going down stairs. (Tr. 55.)

In a typical day, Twaits walks his dog at least four times, taking her on one long, half-hour walk; sweeps the house; cooks dinner; and watches television. (Tr. 59-60.) On a bad day, however, Twaits cannot walk very far and sometimes has to have a friend come over and help with his dog. (Tr. 66.) Twaits reads books and watches movies and can concentrate on both; he also uses his computer for various activities. (Tr. 60-61.) Besides having to sit down to get dressed, Twaits testified that most days he does not have a problem bathing himself, but that some days it is hard due to the pain. (Tr. 61.) Twaits is able to do laundry, wash and dry dishes, and go to the grocery store by himself, although he has someone else bring his groceries up to his apartment. (Tr. 61-62.) He has problems sleeping at night due to his back. (Tr. 62-63.) Because of his fatigue, which happens suddenly and is not tied to any activity, Twaits takes a two-hour nap two to three times a week.[3] (Tr. 63-64.)

## C. The Vocational Expert's Testimony

An impartial VE also testified at the hearing. (Tr. 71-75.) The ALJ asked the VE to assume that Twaits's testimony was totally credible with respect to his limitations—particularly, to consider an individual who has episodic periods of bad days where he is in bed for two or

---

[3] Twaits's case manager at AIDS Task Force also testified at the hearing and essentially corroborated Twaits's testimony. (Tr. 67-71.)

three days at a time, for a total of five such days a month.  (Tr. 74.)  The VE concluded that such an individual could not engage in competitive employment.  (Tr. 74.)

*D.  Summary of the Relevant Medical Evidence*

In August 2008, Twaits was seen by Dr. Matthew Hess, his primary care physician (Tr. 273), due to continued low back pain.  (Tr. 228.)  Dr. Hess recounted that Twaits had been seen earlier that month for back pain and that he worked at a restaurant.  (Tr. 228.)  Twaits reported that his pain was getting worse and that it had never been this severe.  (Tr. 228.)  Dr. Hess noted that the pain radiates down his legs, placed Twaits on pain medication, and ordered an MRI of his lumbar spine.  (Tr. 228.)  This MRI revealed that Twaits had degenerative disc disease at L5-S1 (Tr. 235), but no obvious nerve impingement (Tr. 224).  A few days later, Twaits returned to Dr. Hess for a recheck of his back pain, reporting that the pain medication had helped, but he was still experiencing a lot of shooting pains.  (Tr. 226.)  He had not been able to return to work yet.  (Tr. 226.)  In September, Twaits saw Dr. Hess again, still complaining of low back pain, shooting pains down his leg, and that he was unable to return to work.  (Tr. 224.)  He also recounted a couple episodes of shooting pain down his right arm.  (Tr. 224.)  Dr. Hess diagnosed Twaits with low back pain and ulnar neuropathy, right arm.   (Tr. 224.)

Also in September, Twaits was evaluated by Dr. Daniel Nolan at the Centers for Pain Relief for his back pain.  (Tr. 268-70.)  Twaits described the pain as sharp, shooting, and constant, lasting 76 to 100 percent of the day, and noted that it was aggravated by increased activity, walking, and prolonged laying, sitting, and standing and alleviated by nothing.  (Tr. 268, 275.)  Twaits also reported that the pain wakes him up at night; he rated his current average pain as an eight out of ten.  (Tr. 268.)  On physical exam, Dr. Nolan observed a positive Patrick's

Test on the right, SI joint tenderness on the right, lumbar facet loading positive, lumbar facet tenderness, and pain with flexion. (Tr. 269.) Dr. Nolan's impression was chronic lumbar back pain (along with a history of multi-illicit drug use); he referred Twaits to physical therapy. (Tr. 269.)

The following month, Twaits returned to Dr. Nolan, reporting that his pain had improved with his current medications. (Tr. 264.) Dr. Nolan's impressions were chronic lumbar back pain, history of multi-illicit drug use, HIV, Hepatitis C, and management of high risk medications. (Tr. 265.) During his November appointment with Dr. Nolan, Twaits's pain was still improved with his current medications, but he was experiencing side effects. (Tr. 261.) On physical exam, Dr. Nolan observed lumbar facet loading bilateral, lumbar facet tenderness bilateral, and pain with extension. (Tr. 261.) At his visit with Dr. Nolan the next month, Twaits's pain was unchanged on his current medications, but he reported that his back pain had increased over the past three weeks without any further injury and while taking his medication as prescribed; physical therapy had purportedly not helped. (Tr. 259.) Dr. Nolan's diagnoses and observations on the lumbar/SIJ exam were unchanged from Twaits's last visit. (Tr. 259-60.)

Also in December, Dr. A. Dobson, a non-examining state agency physician, completed a "Physical Residual Functional Capacity Assessment" on Twaits. (Tr. 288-95). Dr. Dobson opined that Twaits could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for a total of 6 hours in an 8-hour workday; could sit for a total of 6 hours in an 8-hour workday; could push and/or pull unlimited, except as shown for lift and/or carry; could frequently balance; and could only occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 289-90.) A second state agency physician later affirmed this assessment. (Tr. 296.)

In January 2009, Twaits was seen twice at the Centers for Pain Relief. (Tr. 254-58.) During his first visit, Twaits reported that his pain was still unchanged and that he was having shooting pain down both legs. (Tr. 257.) His physical exam again revealed lumbar facet loading bilateral, lumbar facet tenderness bilateral, and pain with extension; Twaits was unable to do a straight leg test because he could not lie flat or a flip test because he could not relax his legs enough. (Tr. 258.) He was started on a Duragesic patch. (Tr. 258.) At the second visit, Twaits's pain was improved; he felt that the Duragesic patch was helping more than his oral pain medication. (Tr. 254.) On physical exam, Twaits was still unable to do a straight leg test or flip test. (Tr. 255.) Twaits was released to return to work with restrictions. (Tr. 255.)

The next month, Twaits begin seeing Dr. William Hedrick at the Centers for Pain Relief (Tr. 491-93) after Dr. Nolan abruptly left (Tr. 462). Twaits reported that his pain had improved on his current medications, but his low back pain had increased since returning to work. (Tr. 491.) In April, he had another appointment with Dr. Hedrick, complaining of lumbar back pain that radiated to his hips and legs. (Tr. 488.) He again stated that his pain had improved with his current medications. (Tr. 488.) Twaits also reported that he was about to start treatment for his Hepatitis C, a possible side effect of which was back pain. (Tr. 488.) The following month, May 2009, Twaits visited Dr. Hedrick again, reporting that Prednisone, which had been previously prescribed, had been helpful; his symptoms were resolved; and he was back to "status quo." (Tr. 485.) He reiterated that he was about to begin Hepatitis C treatment. (Tr. 485.)

Later in May, Twaits was evaluated by Dr. Thomas Banas for a neurology consult. (Tr. 471-72.) Twaits reported that he had a hard time sitting for any length of time due to intense pain in his lower back that radiated to both buttocks and down the right leg to the heel. (Tr.

471.)  He described the pain as constant and not responding to Fentanyl patches and stated that the pain increased when walking and bending.  (Tr. 471.)  He had tried epidural steroids without success.  (Tr. 471.)  Dr. Banas noted that an MRI of the lumbar spine showed odd degenerative changes of the disks in the lower lumbar spine as well as a chronic diskitis of S1 and S2.  (Tr. 471.)  On physical exam, Dr. Banas observed that Twaits had percussion tenderness that was "quite intense" in his lower lumbar spine and hamstring tightness of approximately 70 degrees referred to the lower back that did not radiate, that his motor power was preserved with guarding due to referred back pain, and that he moved very gingerly due to low back pain.  (Tr. 471.)  Dr. Banas's impressions were a greater than one year history of intractable back pain, questionable S1 radiculopathy, and HIV infection.  (Tr. 472.)  He stated that Twaits was rating pain from the L5-S1 disk or the S1-S2 disk without MRI evidence from last year of foraminal narrowing in this region.  (Tr. 472.)

An MRI performed at the end of May showed no significant interval change since the prior study.  (Tr. 470.)  An EMG conducted in June revealed a mild prolonged terminal latency of the left posterior tibial motor unit action potential with no corresponding EMG changes to suggest radiculopathy, which Dr. Banas thought may suggest an early mononeuropathy of the nerve.  (Tr. 464.)

Twaits also saw Dr. Hedricks in June 2009, reporting his EMG and MRI results and that he had started Hepatitis C treatment.  (Tr. 482.)  He had his last appointment with Dr. Hedrick in July, stating that he had recently had an epidural injection, which he found unhelpful.  (Tr. 479.)

In August 2009, Twaits was examined by Dr. Mark Zolman for a pain management consultation.  (Tr. 520-21.)  He described his low back pain as aching and shooting into and

8

radiating in his legs and stated that his symptoms were constant and aggravated by walking, standing, and sitting; he received some relief when lying down. (Tr. 520.) Twaits rated his worst pain as a nine out of ten and his best pain as a two. (Tr. 520.) On physical exam, Twaits's gait was stable and nonantalgic, but he had tenderness at the lumbosacral junction and his range of motion of the lumbar spine was moderately limited with pain primarily with flexion. (Tr. 520.) Dr. Zolman's impressions were lumbar degenerative disk disease/facet syndrome/radiculopathy and peripheral neuropathy; he recommended bilateral L5 and S1 facet joint injections (Tr. 520), which were performed later that month (Tr. 516-17).

The next month, Twaits returned to Dr. Zolman for follow up, stating that his symptoms had been under better control and that both the medications and injections had been helpful. (Tr. 514.) He rated his worst pain as a six and his best pain as a three. (Tr. 514.) During the physical exam, Dr. Zolman observed some tenderness in Twaits's right lumbar paraspinals and pain primarily with lumbar extension. (Tr. 514.)

In January 2010, Dr. Zolman examined Twaits again; Twaits stated that his symptoms had been returning since their last visit and that he was noticing more pain in the lumbar spine that was worse on the right side. (Tr. 530.) He also reported some right thigh pain and that the pain sometimes worked into the ankle. (Tr. 530.) At worst, Twaits rated the pain as an eight; at best, it was a three. (Tr. 530.) On physical exam, Twaits continued to have pain with lumbar extension, but there was no significant lumbar tenderness. (Tr. 530.) Dr. Zolman indicated that he was going to schedule Twaits to repeat the bilateral L5-S1 facet joint injections and for some physical therapy. (Tr. 530.) In March, Twaits reported to his infectious disease doctor that he had back injections the month before and then physical therapy and that his pain was much

improved.  (Tr. 561.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A),

1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3),

1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An

affirmative answer leads either to the next step or, on steps three and five, to a finding that the

claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer

at any point other than step three stops the inquiry and leads to a finding that the claimant is not

disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On September 30, 2010, the ALJ rendered the decision that ultimately became the

Commissioner's final decision. (Tr. 15-28.) He found at step one of the five-step analysis that

_____

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Twaits had not engaged in substantial gainful activity since his alleged onset date, and, at step two, that Twaits had the following severe impairments: chronic low back pain with lumbar spine degenerative changes, history of being HIV positive, history of Hepatitis C, and bipolar disorder/depression and anxiety. (Tr. 17.) At step three, the ALJ determined that Twaits's impairment or combination of impairments did not meet or medically equal a listing. (Tr. 18-20.) Before proceeding to step four, the ALJ determined that Twaits's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform "light" work . . . which usually involves lifting, carrying, pushing and pulling up to 20 pounds occasionally and 10 pounds frequently, the ability to sit up to 6 hours out of an 8 hour workday, and the ability to stand/walk in combination up to 6 hours in a typical 8 hour workday. However, he has the additional limitations as follows: he can only occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, and he can have no exposure to extremes of hot or cold temperatures and high humidity. He would be further limited to unskilled work (i.e. understanding, remembering, and carrying out simple routine tasks over an eight hour workday), and must have a flexible work pace.

(Tr. 20, 22.)

Moving onto step four, the ALJ found that Twaits was unable to perform his past relevant work as a chef. (Tr. 26.) At step five, however, the ALJ found that Twaits could perform a significant number of other jobs in the economy despite his impairments, including cashier, small products assembler, and cleaner or maid. (Tr. 26-27.) Thus, Twaits's claims for DIB and SSI were denied. (Tr. 27.)

### C. The ALJ's Credibility Determination Will Be Remanded

Twaits's only argument on appeal is that the ALJ committed legal, and reversible, error by merely reciting a much criticized "template" in making his determination as to Twaits's

12

credibility and failing to articulate specific reasons why he discredited Twaits's testimony. (*See* Opening Br. 13.) Although the Commissioner attempts to save the ALJ's credibility determination by pointing to various factors the ALJ purportedly considered, the ALJ's failure to make a proper credibility determination ultimately necessitates a remand.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"). At the same time, the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. An ALJ may not reject subjective complaints of pain solely because the medical evidence does not fully support them. *Powers*, 207 F.3d at 435.

Here, the ALJ undoubtedly used a "template" in making his finding as to Twaits's credibility. After reviewing Twaits's testimony at the hearing, his daily activities, and his case

manager's testimony, the ALJ first found that Twaits had medically determinable impairments that could reasonably be expected to produce his alleged symptoms and then concluded that Twaits's "statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the above residual functional capacity assessment." (Tr. 22.)

This quoted language is a template that the Seventh Circuit Court of Appeals has repeatedly criticized as "unhelpful," *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), "opaque," *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), and "meaningless," *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (discussing a close variant of this template). Specifically, it has explained that this template "fails to inform [the Court] in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible" and backwardly "implies the ability to work is determined first and then used to determine the claimant's credibility." *Bjornson*, 671 F.3d at 645. This reversal is problematic because the assessment of a claimant's ability to work often depends, at least in part, on the credibility of his testimony regarding the intensity of his symptoms. *Smith v. Astrue*, 467 F. App'x 507, 511 (7th Cir. 2012) (unpublished). Ultimately, "[c]redibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." *Shauger*, 675 F.3d at 696 (citations omitted).

More importantly, this template "fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony." *Mueller v. Astrue*, 860 F. Supp. 2d 615, 632 (N.D. Ill. 2012). As such, this sort of boilerplate language, on its own, is inadequate to support a credibility finding. *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir.

14

2012) (unpublished); *Mueller*, 860 F. Supp. 2d at 632; *see Gayfield v. Astrue*, No. 12-CV-375-JPS, 2012 WL 5471874, at *4 (E.D. Wis. Nov. 9, 2012) (noting that if the boilerplate language alone constituted the ALJ's full assessment of the claimant's credibility, then this is a reversible error).  On the other hand, its mere use does not render a credibility determination invalid; rather, "failing to accompany that language with an 'explanation and evidence from the record does.'" *Tovar v. Astrue*, No. 11 C 2660, 2012 WL 3717729, at *10 (N.D. Ill. Aug. 27, 2012) (quoting *Mueller*, 860 F. Supp. 2d at 632).

In the instant case, the ALJ recounted Twaits's testimony regarding his symptoms and daily activities, dropped in the template finding his testimony "not credible to the extent" it was inconsistent with the assigned RFC, and then recited some of the medical evidence in the record without further addressing his credibility determination.  (*See* Tr. 20-26.)  But this template alone is insufficient to support a credibility finding, *Richison*, 462 F. App'x at 625, and, although "the subsequent paragraphs of the ALJ's opinion tick off certain medical evidence, this account does not specify *how* the evidence undermines [Twaits's] credibility or which statements the ALJ found not credible," *Smith*, 467 F. App'x at 511-12 (emphasis added).  Nor does the ALJ give specific reasons for his credibility finding, *see* SSR 96-7p, 1996 WL 374186, at *2; he simply drops in the template and moves on.  As such, the ALJ failed to provide a sufficient explanation for his determination that Twaits lacked credibility, *Tovar*, 2012 WL 3717729, at *10, or to support his credibility determination with reference to specific record evidence, preventing the Court from assessing whether that credibility determination was patently wrong and necessitating a remand, *Smith*, 467 F. App'x at 511-12.

Undeterred, the Commissioner contends that the ALJ *did* provide specific reasons for

finding that Twaits's subjective complaints were not fully credible by considering factors such as

Twaits's alleged symptoms, his broad range of daily activities, evidence that he reported

improvement with physical therapy and medication, the mild MRI and EMG findings, the

absence of any significant symptoms from his HIV or Hepatitis C, and his own statements

regarding how much he could lift and how long he could sit, stand, and walk.  (Def.'s Mem. in

Supp. of Comm'r's Decision 5.)  Although the ALJ certainly mentioned all of these things, he

never cited them as specific reasons for discounting Twaits's credibility or explained *how* they

purportedly undermined his credibility.  *See Smith*, 467 F. App'x at 511-12; *Tovar*, 2012 WL

3717729, at *10; SSR 96-7p, 1996 WL 374186, at *2.  Nor is it obvious to the Court how these

factors undermine Twaits's credibility.[5]  The Commissioner's contention that these factors

support the ALJ's credibility determination is nothing more than an impermissible *post hoc*

rationalization of the ALJ's credibility determination, one this Court cannot consider.  *See*

*Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are

the reasons articulated *by the ALJ*." (emphasis in original)); *Phillips v. Astrue*, 413 F. App'x 878,

883 (7th Cir. 2010) (unpublished) ("We confine our review to the reasons offered by the ALJ

---

[5] Regarding Twaits's alleged symptoms—which appear to be primarily his complaints of back pain—even if they were not supported by the MRI and EMG findings, which the ALJ does *not* give as a reason for discounting his credibility, the ALJ may not discredit them solely because of a perceived lack of corroborating medical evidence. *See Doering v. Astrue*, No. 10 C 5730, 2012 WL 1418851, at *3 (N.D. Ill. Apr. 24, 2012).  As the Seventh Circuit has noted, "[c]laims of severe pain can be credible even if they are unsupported by significant physical and diagnostic examination results."  *Ramey v. Astrue*, 319 F. App'x 426, 429 (7th Cir. 2009) (unpublished) (citing *Carradine*, 360 F.3d at 755).

Moreover, while "an ALJ may consider a claimant's daily activities when assessing credibility, [he] must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *accord Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009).  Here, although the ALJ described Twaits's daily activities, he never even *mentioned* any perceived inconsistencies between those activities and the medical evidence, let alone explained them.

And as to the Commissioner's argument that Twaits improved with physical therapy and medications, not only did the ALJ, once again, *not* make this argument, but, as the Seventh Circuit has noted, "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."  *Scott v. Astrue*, 647 F.3d 734, 439 (7th Cir. 2011).

and will not consider post-hoc rationalizations that the Commissioner provides to supplement the ALJ's assessment of the evidence.").

In the end, the ALJ's complete reliance on the template to discredit Twaits's symptom testimony and failure to provide specific reasons for that determination prevents this Court from assessing the weight the ALJ gave to Twaits's testimony, the reasons for it, or whether that determination was patently wrong. *Smith*, 467 F. App'x at 511-12; *see* SSR 96-7p, 1996 WL 374186, at *2. Furthermore, because the VE testified that Twaits would be precluded from engaging in competitive employment if his testimony regarding his five days of essentially debilitating back pain per month was fully credited (Tr. 74), this error was not harmless. *Cf. Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case"). As such, because the ALJ failed to build a logical bridge between the evidence and his credibility determination, resulting in an harmful error, a remand is warranted. *See Ribaudo*, 458 F.3d at 584.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Twaits and against the Commissioner.

SO ORDERED.

Enter for this 2nd day of April, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge